Richard Rochford for Eastman Kodak Company. I'd like to focus on two points this morning. First, the Special Master improperly ignored literal infringement of the 426 patent by AGFA's Cronex 10T product. Second, Kodak's September 1995 notice letter covered the Cronex 10T family of products as a matter of law and therefore extended to the Cronex 10TL product. As to literal infringement, under the law, as Judge Rader, you recognize in the Ambrex case, if a defendant's product infringes some of the time, it infringes. There's no exception for de minimis. Well, it's just a little part of the product infringes. I'm picturing this, and maybe I've got it wrong, but I'm picturing a big x-ray film of some sort. I'm picking samples from here and there on that film. Is that the right way to picture it? It starts to be, Your Honor. You cut out a section of the film, and according to the protocol set forth in the patent, you take that sample, you measure 100 grains according to a transmission electron micrograph process, and you determine what the characteristics are of the grains in terms of thickness and aspect ratio, and that tells you projected area. But I assume they vary throughout the film, so the question is how many samples from one particular size of film is necessary to say that film is, in fact, an instance of infringement, or is it not? Somebody made the analogy, and I know you said it was an attorney argument, but the postage stamp versus the map of the United States or something like that, is that? Well, there are two things to recall in that context. First, the defendants have indicated that their products are largely homogeneous. Second, the patent tells you exactly what you have to do to know whether you infringe or not. And how many times you have to do it? How many samples you have to take? There's nothing in the patent about how many samples. What the special master said is, if you take, this is right out of the special master's ruling. This is at page 163 of the appendix. It is understood by a person skilled in the art that an analysis based on 100 to 150 grains is sufficient to determine whether a sample falls within the scope of the T-grain patents. And AGFA's own witnesses testified at trial to know whether you fall inside or outside the Kodak patents. You have to do that test. Once you do that test, an infringement is shown. You infringe. The special master said you had to do it how many times? He didn't say anything about how many times. Well, what he said here is once you do it, once you do an analysis based on 150 grains, that's sufficient. Oh, 150 grains. 100 to 150 grains is one test, Your Honor. So we read the special master's decision to say one test. And AGFA's own testimony indicates that one test, if you run that TEM and it shows infringement, you infringe. Then the question is, how much did they infringe? And as a practical matter, I think it's clear from the record that AGFA made a product that sometimes infringed literally, sometimes had insubstantial differences, and sometimes fell a little further outside. But they still infringe. Mr. Rushford, there are 21 samples here, four infringed, but one of them is contested. AGFA got a different result. The two of them that came up positive were from the same film sample, making them somewhat discountable. Aren't we getting down to the point where it's almost de minimis? No, you're not. And besides, as you recognize, Your Honor, there is no de minimis exception. But beyond that, first two of those samples that you referred to are from 1996. They're before Sterling, the predecessor to AGFA, changed the thickness of the grains. And we've never said that the 1996 product infringes. So those shouldn't be included at all. Secondly, in terms of the point that the special master relies on to claim that the results are somehow unreliable because there's a scatter effect when he looks at the samples, in fact, there's really not. And this, I think, gets to the point here. If you look at the special master's table, and he has a number of samples in there. One of them, at number 18, if you look at the grains less than 0.2 microns, the total projected area there is 9.32%. And AGFA would say that's an outlier. But if you add in the grains, in other words, if you consider all of the grains, from zero thickness to slightly larger than 0.2 to 0.223, you have 70.51% of the projected area covered. In other words, AGFA is taking advantage of the benefits of the invention, using thin tabular grains for predominance of the projected area, and they're doing it in a way that's insubstantially different than the patent calls for. Counsel, I found the lower court to find credible Dr. Apley's determination that there exists random sampling and measurement errors that would result in a range, percentage-wise, from, what, 37 to 56? And that meant more likely than not, each individual product would not infringe. It's not that some are 37 and some are 56, which would support your sometimes argument. It's that the error range is so big for a single product that it's more likely than not not infringing. I mean, how is that not? First of all, the patent sets forth the protocol that's to be used. And everyone at Skill in the Art knew that, and all of these companies used that test to determine whether or not their products infringed or not. There was never any type of Apley analysis or additional error analysis applied. So as a matter of law under Genentech and other cases of this court, you apply the test that's in the patent. That's my legal point on that. Factually, though, you, I think, made the same error, with all due respect, that the special master made. He took Apley's report and made a conclusion that Apley said he could not make. And if you look, we've got it in our reply brief. The only Apley analysis as to these Cronix 10T literal infringement products is there. And you'll see that the Apley box crosses over. It intersects with the literal infringement zone. So part of, even applying Dr. Apley's analysis, part of his box is literally infringing. And what Dr. Apley testified is, all he can say is that the sample was somewhere in his shaded box. He cannot draw the conclusion that it's just as likely to be one place or another within that box. So therefore, he cannot say it's just as likely to be inside or outside. All he could say was that it's in that box. And because that box includes literal infringement zone, that in fact supports codex view. Dr. Apley didn't take that sample outside. But back to your point, Your Honor, the fact is that four of these do infringe. The fact that the results showed some variation doesn't mean the tests are unreliable. It simply means that's how the products were made. And some literally infringed. Some fell with an insubstantial difference. And some fell further outside. That's the mix of grains that AGFA used. And as a matter of law, by doing that, and the question might be, why did they do that? This was a hundred of millions of dollars in business in these x-ray films every year. And by making these films to take advantage of the tea grain properties that Kodak had invented, AGFA was able to compete, not just against Kodak head to head, but for large purchasing contracts that were exclusive, AGFA would have this full range of competitors. But you agree that there's a 10% error range. No, Your Honor. That, I think, is a mistake. And there was some testimony in there that Mr. Van Dam's testing was accurate within a certain percentage. I don't believe that you can project that to 10%. There's expert testimony in the record that says that his testing was extremely accurate and did not affect the results. It's a little confusing to me mathematically, but the point was that it was of such a small scale that it was accurate. But beyond that, Your Honor, as this Court's recognized, if you are following the test that's prescribed in the patent and it shows infringement, and by the way, a number of the samples that we claim infringe are AGFA's own testing. They're admissions. There was no error analysis as to those samples. You've got some infringement. Therefore, it's only a question for damages as to what the quantum of that infringement was, what the economic impact of that infringement was, that the district court has to consider on remand. I know you didn't mention this as one of your points, but I did have a question about your doctrine of equivalence analysis. It kind of seemed like it was if the product is in the numerical parameters, it literally infringes, and if it isn't quite, then it's close enough, and that's the doctrine of equivalence. Is that your argument, or do you have a function-by-function analysis that you could explain? We did, Your Honor, and the function-by-result proof was all put in by Mr. Dillenbach, and the critical part of that, I think, was the way aspect, and the way in which the doctrine of equivalence is met here, the differences are insubstantial, is you still have a predominant amount of thin tabular grains with an average aspect ratio that's called an intermediate aspect ratio. So you have not quite enough, but close enough? Well, and it gets to the point, and this court's made clear that when you're dealing with numerical ranges, as we have in this case, you've got 0 to 2 microns on thickness, you've got 5 to 1 to 8 to 1 on aspect ratio. Kodak's entitled to a scope of equivalence for those products, and these differences, indeed, are insubstantial. That's shown by the fact that the literally infringing products are the same products that had these insubstantial differences. If what you're struggling with, Your Honor, is where's the boundary of that doctrine of equivalence, I think it's grains that are slightly thicker, and we didn't claim that all 19 of the samples infringed under the doctrine of equivalent, but four of them did, so you've got 8 out of 19 that are clearly infringing on Cronex 10T, and a higher number on Cronex 10TL, which takes me to the notice point. If notice as to Cronex 10TL is found by this court, then that infringement finding, which was not contested by AGFA on Cronex 10TL, will stand. The district court ruled that Kodak failed to give notice of infringement with respect to Cronex 10TL. That ruling's wrong as a matter of law. Even AGFA concedes that under GART v. Logitech, a notice directed to a specific product is effective to that product and its family. In GART, this court reviewed the district court decision and held as a matter of law the notice directed to a TrackMan Marble product also extended to the family of TrackMan Marble products, TrackMan Marble Plus, TrackMan Marble FX. They say this isn't the same family because one X-rays bones and the other X-rays large muscles. But first, Your Honor, that may be a difference in ultimate use. And in fact, their literature somewhat contradicts that. It says the 10T is used for all applications, and the 10TL is the latitude version. But there are substantial compositional differences between the two. They're not substantial, Your Honor, particularly not as to the grain elements of the claim. Both products have a preponderance of thin tabular grains in the emulsions. And they use the same. What they did to make the contrast difference in 10TL was they added a small number of thin non-tabular grains to change the contrast. But that didn't impact these grain characteristics that are subject to the case. But what AGFA says about this, they say the products are different. But they admit repeatedly, going back to when they introduced these products in the 1980s, that they're of the same family. And just to pin that down, I think a few references from the record would be helpful. Dr. Hudson testified at trial, I often refer to CronX 10TL as a sister product. CronX 10TL is the companion latitude version that goes along with CronX 10T. He also said they're related, they're in the same family. Mr. Wasser and Mr. Russell, AGFA executives, said much the same thing. 10TL is what we call the latitude version of the 10T family. Their technical reports say that CronX 10T lacked the companion latitude film. CronX 10TL is that companion film. And finally, this is, I think, the one that really brings this home. AGFA says we're applying the same technology approach to both. We're applying the same technology approach to the sister product CronX 10TL. We'll make the thinner grains in the same fashion in 10T and 10TL. It perfectly meets the court's views expressed in SRI in later cases. The purpose of notice is to inform the infringer of the patent and of the activities which constitute infringement. In 1995, Kodak sent a letter about the CronX 10T family of products, discussed it with DuPont. DuPont has this family of products that they make in the same fashion with respect to the parameters of this patent. As a matter of law, that was proper notice for that product under guard. I'm happy to take questions if there are other topics that are of interest to the panel. Thank you, Mr. Rochford. You've consumed your time. We'll restore two minutes to you for rebuttal. I appreciate that. And could you give Mr. Hartman an additional two minutes if he needs to use it, and we'll come out about evening. Good morning, Your Honor. This is Mike Hartman. Can you wait just a second, Mr. Hartman? Now you may proceed. This is like the NFL. We always have to get the clock right. Yes, thank you. Well, good morning. My name is Mike Hartman. I represent ACFA. I think Kodak has had seven years to get their data right and to get the testing done that they needed to do to get these patents held, infringed if they could. Kodak is the vaunted Kodak. The laboratories are virtually no limits. Scientists with PhDs all over the hallways. They're telling us here they could get not a single data point to fall within, for the 10-TL product, to fall within the claim limitations. Counsel, they say there are four data points that were established to fall within it. For 10-TL, no data point actually fell within the claimed range with any degree of confidence. Isn't that only if we accept Dr. Apney's error? Isn't Mr. Rochford correct that the patent lays out the tests that ought to be used to determine the range and the potential infringement? You're distinguishing between the 10-T and the 10-TL here? I'm addressing the 10-T first because that's the only product that was held literally infringed. Oh, no, I thought you said the 10-TL. I'm sorry, the 10-T, that was the product that was held not infringed because there was no data that supported infringement. So you are talking about the 10-T that has the four data points? Four out of 21. With the four out of 21. The answer to your question is the particular test to be used for the grain sizes is not in the claim. It is expressed to be sure in the specification. It is addressed in the specification, not, however, as a requirement. But they're not saying you don't infringe if you use a different test or you do infringe if you use a different test, but they're saying here's the range that we claim, and then in the specification they teach you to determine whether you fall within that range. Here's the test to apply. That's right, and the test consists of getting 100 sample points, if you will, for one specimen,  that is, it's examined under a scanning or an electron microscope, a transmission electron microscope. It's 10,000 magnified. But it can be done. So statistically what I'm saying is you have 150 data points or between 100 and 150 data points. That inherently injects an error, a sampling error. But if there are four of those in the postage stamp the size of the U.S., if we did the whole U.S., we'd have an awful lot of infringement, wouldn't we? We would certainly, in order to be able to confidently, within the scientist's level of confidence, 95%, in order to confidently say whether you were within or without the range of the claim, one would have to do more testing. That's clear. We are talking about two billion square feet of film, and yet they have four data points. Now, I'm talking two billion in terms of all films that were accused. But they only had 160 total data points. It is a sorry state of record when you come to court and you say, I want royalties on two billion square feet, and you show up with 160 samples. Well, counsel, isn't that just a measure of damages? That's not a failure of proof of infringement. It's a measure of damages. So you don't get two million. You get 160 or some representative sample in the whole. And I would respectfully disagree in this case because the data that was submitted, let's say for the TNT that was held to be non-infringing, the data was so unreliable that to a scientist, a person of ordinary skill in the art, given the test regimen set forth in the patent, it would be impossible to decide to a 95% confidence level when any of these four points are within or without the patent. But this is a preponderance standard. That's more than 50%. Why are you talking to us about 95%? Because that is the normally applied standard in this field, in this science. That's what their own scientists applied, the 10% error, Your Honor, that you referred to earlier that their own scientists had identified. They also used the 95% confidence level. That is a commonly applied scientific standard to test sets of data, to see what is the error rate when you say one number. So my point is when you test these, under the test of the patent, you come up with a data point. But that data point has an inherent error range. And it is incumbent on the patentee to prove that the data is reliable enough so that the court may determine that there really is infringement. This is not as much a preponderance of evidence standard as it is simply as a matter of science. We need some reliable data to even talk about whether there is a preponderance standard. But we're all applying the test that is specified in the specification. It's the only way we test for infringement given what the specification gives us we have to deal with. So there are uncertainties in this art. We have to deal with those, don't we? And we dealt with them, Your Honor. That's precisely my point. But they dealt with them and you were found to infringe four out of, well, about a fifth of the time. On the 10-T, you mean? On the tested, that's the 10-T. The 10-T we were held not to have infringed. Yes, but the data showed that about 20% of the time there was infringing data. There were four points that are statistically not reliable. Four points out of how many? I'm sorry? Four points out of 150? Four. There were 21 data points for that particular product altogether. The data set was 21 and only four fell within the range of the patent and all four were statistically questionable. Counsel, if we applied your error rate to some of the ones that didn't fall within the range, I bet we could move some of those over. And so, you know, it's good for the goose. It's good for the gander. Judge, and I would respectfully, I would dare you to do that. It will not fall within the data range. You see, that's what happens. The boxes will not lie within the claimed range. You cannot tell with this scientifically accepted 95% confidence level whether the point is within or without the claims. Now, one point, these claims of these patents do not cover T grains. They do not. They have a specific range. If we tested one million film, we'd certainly get a lot more data points. Would you then be willing to go with infringement? And I would, Judge Reiter, I wouldn't suggest for a minute that it should be a million tests that they had to carry out. But there has to be somewhat more than four. But see, the problem you're giving us is that with any small sample, your unpredictability is going to rise. And yet, even with a small sample, we have something. If we enlarge the sample, you tell us we don't need to do that. And what I'm suggesting is that Kodak knew very well what numbers of samples they needed to come to court with and have some sense of confidence. So you're putting the burden on them? Well, they're the plaintiffs. Of course. They are the plaintiffs. They needed to do that. Suppose that all 21 samples fell within the range. Mr. Appley is still telling us we shouldn't have confidence in those determinations because of the error rate. What would happen then? If all 21 fell within the range, and some of them fell within the range so that even these AP boxes were completely within the claims, I wouldn't be arguing here. I wouldn't be making the point I'm making now. Is it possible to have a result that's completely within the range just out of curiosity? Or is your error range so large that on both ends it's small? No, no, no. The boxes were a small fraction of the range of the claim. No, no. The boxes compared to the range of the claim were maybe 1 20th or 1 30th. So it's well possible to have data fall fully within the patent range and still have an error range to them that was also within the patent range. That is quite possible. So my point is that this data is unreliable. Not that there is a question of how much infringement there has occurred. We disagree with Kodak on that very point. We think that the data, as the special master and the judge decided, is simply not accurate enough for a court to base a conclusion of infringement on. I'm interested in your cross appeal on the 10 TL and the ortho G in terms of the necessity of doing the sensitization measure. Yes. And what happened? Well, I know what you say happened is that the special master kind of forgot the claim construction that he had made earlier and didn't look at the sensitization. Your opponent says that that was a rolling claim construction and I guess sort of, and he can address this I'm sure, but sub silencio altered the claim construction such that the 60% sensitization wasn't necessary. What's your thought on that? That's exactly right. We had a claim construction about a month before the trial occurred in which the special master and the judge decided that the claims, the sensitization element of the 426 claim required 60%, the optimally spectrally, I mean the optimally sensitized required 60% of maximum speed. And was that a construction you were proposing or was that an agreed upon construction? It was a construction we proposed, but not entirely. I think he picked a little bit between the two proposals. Then when we went to trial, the special master applied the construction that it was to be the speed, maximum speed under contemplated conditions of use and process. Now that all but vitiated that claim term. But didn't your Dr. Hudson agree that you were using optimally sensitized maximum speeds? Your Honor, he did not. In fact, he testified that some of the ACFA films that are here accused could be accelerated, if you will. The speed could be improved, increased by 50% or more. That's what the record says. He's conceding that they were developed using some kind of maximizing speed, right? He conceded that they were optimized, and this is my point. Who contemplates under these contemplated conditions of use? Who's contemplating and what are they contemplating? ACFA, a European company, sells films, for example, into Africa, in which case the ability to keep the film under perhaps hot conditions is the single highest criteria to which they design these films. They sacrifice speed when they do that. These are conflicting parameters. You can either get very, very fast film or you can get very, very durable film, something that lasts for a little while. And so what you optimize to is in the eyes of the beholder. It is intended for a particular end-use customer so that this element is really nothing in the patent claim. It vitiates the entire optimization element in the claim. If you don't use the 60%. Yes, unless you use the 60%, which was the definition in the patent. And was this other definition something that was contested in the claim construction, or did this just arise as a new thing? It was contested, Your Honor. And this was the alternative that was proposed? Yes. And not chosen? Well, not chosen initially, but then applied as a practical matter by the trial court at trial because I have a feeling perhaps it didn't realize the consequences of that construction earlier. So if indeed this court construes that claim as it should, we believe there is a definition in the patent that specifically says what maximum… The claim construction already accounted for contemplated conditions of exposure, right? Right. So they already factored out your concern about Africa films or whatever. No, Judge. And then the court had reason to rely on your expert that you were still maximizing. No, Judge. The contemplated condition of exposure is a completely different concept than the contemplated conditions of use and processing. If you look at the column 23, lines 35 to 38 of the patent, it talks about exposure. The contemplated conditions of exposure talks about the intensifying screen that is used with these x-rays. That's all it talks about. It's not a condition of use at all or processing. That's a completely different criteria. You need to have green films if you're green sensitive or blue or UV plates if you're sensitive to that. So I hope I answered your question, Judge Wilkin, on the claim construction. We were frankly surprised to all of a sudden be faced with a new claim construction. If the original claim construction stands, there is no question in anyone's mind, no evidence of that. Counsel, you're appealing the 10-TL determination of infringement despite the fact that you were found to owe no damages and can't be enjoined. I want to ask you, are you a prevailing party in light of the fact that you can't be enjoined and owe no damages? Even though you were found guilty of infringement, are you a prevailing party? We believe we are, Judge, because we prevail on a notice defense, which completely voided any claim for damages by CODAC. You think that would you analogize that to, say, a laches defense or an equitable estoppel defense or something that doesn't necessarily, well, at least in the case of laches, it doesn't affect the patentee's right to assert against other people? Right. Isn't it a statutory defense? I mean, we have the notice provision in the statute, so I don't know what the right analogy would be, but it certainly is a defense which, in my mind, is as good as a 102A defense or 103 defense or call it what you will. It's a statutory defense. Right, but you recognize that this would be a unique case because the patents have expired, right? Because if they could secure an injunction against you, the absence of damages wouldn't make you a prevailing party, would they? They couldn't obtain an injunction because the patents have all expired when they sued. Right. So that makes us a totally prevailing party. There's no other relief that CODAC had. Do you want to save any time? I will. Thank you, Judge. Thank you. Mr. Rochford, we gave you back your two minutes. I appreciate that, Your Honor. First, on the literal infringement point, Mr. Artman talked at length about CODAC's testing, but what he's ignored is that AGFA's own testing, which was not subjected to AFLI or any other error analysis, showed samples that literally infringed. That's really the end of the inquiry on that. As far as the sensitization term, remember that the claim term there was substantially optimally sensitized, and the special master recognized and goes on at length in his finding that people of skill and the art knew exactly what optimally sensitized means. AGFA addressed that term in its own patents. In other words, lots of evidence was given. Did he ever explain how he was reconciling his prior claim construction to the analysis he used at trial? He said that it was consistent with. I don't have the page, but he did note that it was consistent with his initial construction because that initial construction talks about a radiographic element, which he had defined as a commercial product. It talked about using intensifying screens to get an image, again, in this practical context. But the claim construction said 60%, and there was no evidence that that was fulfilled. Your Honor, what it says, just so we can be clear on this, the spectral sensitizing dye is absorbed to the surface of the tabular silver halide grains in an amount sufficient to reach at least 60% of the maximum log speed attainable from the grains in the spectral region of sensitization corresponding to the wavelength of electromagnetic radiation to which the element is being image-wise exposed by intensifying screens. That last caption there, the special master properly recognized, to have a radiographic element that you can use, you have to have what the specification calls for. It's not a theoretical maximum speed, but what everyone in the industry understood optimal sensitization to mean, which is you get the maximum speed you can consistent with whatever your particular requirements. In fact, they're more commercial requirements. You need to draw it to a close here, sir. Our fog, shelf life, and others. Can I just add one point on that? The testimony that Mr. Artman referred to that AGFA could make a faster film, that film had no shelf life. It was not a commercial product. It would not have been considered optimally sensitized. Thank you, Mr. Rochford. Mr. Hartman, you have about two minutes remaining, and you need to stick now with just the cross-appeal. Yes, and I will only say the appeal that Kodak filed is based on a request for you to reverse factual findings. We've had a 122-page opinion. We've had a seven-day trial. We've had a parade of scientists in the court. Are you addressing the cross-appeal and the cross-appeal only? Right, and in that record that was developed on the question of the claim, whether the claim is infringed, what it means, we had specific evidence that what the claims meant. We had a decision of what the claims meant, and there's no question, no question, that there's no evidence at all of the 50% or 60% limitation. There's no evidence at all of the maximum speed. That is totally lacking. So in the event you reverse on the notice, for example, on the 10T, then we need to reach that claim construction point and whether there was evidence to support the infringement conclusion. That actually relates to all of the films in suit. If we left notice intact, do we not need to reach it then? I don't believe so. Thank you. Thank you, Mr. Hartman. Our last case this morning is N. Ray Hyatt.